# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION



CASE NO.: 5:99-CV-677-BR(2)

FILED

!APR 2 9 2002

DAVID W. DANIEL, CLERK
US DISTRICT COURT, EDNC
BY _____ DEP. CLERK

| | |
|---|---|
| RICH FOOD SERVICES, INC., a Wyoming corporation, DEBRA K. SINGLETARY, and ROY A. BALDWIN, Plaintiffs, | ) ) ) ) ) ) |
| vs. | ) ) ) |
| RICH PLAN CORPORATION, a Delaware corporation; HERMAN A. GEIST; HAROLD T. BROADHURST WILLIAM R. WILSON; Defendants. | ) ) ) ) ) ) ) |

**PLAINTIFFS' MEMORANDUM OF OF LAW IN OPPOSITION TO DEFENDANT HAROLD T. BROADHURST'S MOTION FOR SUMMARY JUDGMENT**

cy/128

## TABLE OF CONTENTS

Page No.

I. INTRODUCTION ........................................................... 1

II. STATEMENT OF THE CASE .................................................. 3

III. REPLY FACTS ........................................................... 5

IV. ARGUMENT .............................................................. 11

    A.   Broadhurst is liable for both his individual acts and omissions, and for his acts and omissions as a director or employee of RPC ................... 11

        1.   Broadhurst is liable for his individual wrongful acts and omissions apart from liability arising out of his wrongful acts as a director during the period 1992-1994 ...................................................... 12

        2.   Broadhurst is also liable to the plaintiffs for his acts and omissions while a director of RPC ............................................. 14

    B.   Broadhurst's claim regarding the lack of the plaintiffs' "justifiable reliance" upon his misrepresentations and concealments has been previously rejected by the Court ........................................ 16

    C.   Neither the claims against Broadhurst individually, or relating to his status as a director of RPC, are barred by any applicable statute of limitations ......... 17

        1.   Statute of limitations claims with regard to the plaintiffs' fraud and misrepresentation claims (Count II), and New York Consumer Protection Act violation (Count IV) were previously advanced by RPC, and rejected by the Court ............. 17

        2.   Broadhurst's limitation claim regarding the North Carolina UDTPA should be rejected ............................................................ 18

        3.   Broadhurst's limitations claim regarding his liability as a director should be rejected ............................................................ 19

D.   Broadhurst's claimed "lack of knowledge" of the illegality of the "Full Service Program"/FSA is a question of fact, and otherwise irrelevant ................. 21

1. Broadhurst's knowledge of the illegality of the "Full Service Program"/FSA is a question of fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2. As a director of RPC Broadhurst was legally obligated to determine the illegality, or possible illegality of RPC's programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

3. Broadhurst had a duty individually, as a self-declared expert from whom the plaintiffs sought advice, at his invitation, to determine the legality of the RPC programs he had designed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

CASE NO.: 5:99-CV-677-BR(2)

RICH FOOD SERVICES, INC.,      )
a Wyoming corporation,         )
DEBRA K. SINGLETARY, and       )
ROY A. BALDWIN,                )
                Plaintiffs,    )
                               )      **PLAINTIFFS' MEMORANDUM OF**
vs.                            )      **OF LAW IN OPPOSITION TO**
                               )      **DEFENDANT HAROLD T.**
RICH PLAN CORPORATION, a       )      **BROADHURST'S MOTION FOR**
Delaware corporation;          )      **SUMMARY JUDGMENT**
HERMAN A. GEIST;               )
HAROLD T. BROADHURST           )
WILLIAM R. WILSON;             )
                               )
                Defendants.    )

## I.  INTRODUCTION

In their several submissions to the Court during this case, neither the defendant Rich Plan

Corporation ("RPC"), nor the individual defendants, have denied the illegality of RPC's "Full Service

Program," and "Full Service Agreement" ("FSA"), which comprised the critical component of RPC's

"unique marketing system" the plaintiffs were persuaded, and contractually required, to implement

per the Franchise Agreement.[1]  Nor have those defendants denied their complete, and continuing,

wholesale failure to comply with both federal and New York franchise disclosure and registration

--------

[1]This concession is consistent with the finding of the Court in its Order of November 20,
2001, p. 15, fn. 7: "The aspects of the FSA challenged by the AG's office were provisions
included in the FSA received by plaintiffs from RPC. There is no suggestion that plaintiffs drafted
or added the problematic provisions. Rather, plaintiffs were marketing a product provided to
them by RPC.

requirements. In the face of these admitted failures, the defendant Broadhurst now seeks to avoid liability by arguing that the wrongs related to RPC's illegal "Full Service Program"/FSA occurred at a time when Broadhurst was not a director of RPC upon whom individual liability could be imposed.[2] However, the arguments advanced by Broadhurst ignore the following critical facts:

- Broadhurst is individually liable for his own wrongful acts and omissions occurring when he was *not* an RPC director;[3]

- Broadhurst is individually liable for his wrongful actions, and omissions, while acting as a director of RPC during the period March 1992 to October 1994;[4]

- The Court has previously considered, and rejected, Broadhurst's statute of limitations claims in the context of RPC's prior motion for summary judgment;[5]

- Broadhurst's claim that the plaintiffs did not justifiably rely on his actions or omissions has been previously rejected by the Court in the context of its denial of the same claim

---

[2] Broadhurst makes no attempt to address the failure of RPC to comply with the federal and New York franchise registration and disclosure requirements that emanated from the 2 and ½ year period that Broadhurst was an RPC director, and which have continued to date thereafter.

[3] Fraud, intentional misrepresentation, concealment and negligent misrepresentation (Count II); violation of the North Carolina Unfair and Deceptive Trade Practices Act (Count III); violation of the New York Consumer Protection Act (Count IV).

[4] A period during which Broadhurst continued to be responsible for the development of RPC's marketing "system," and "Full Service Program"/FSA.

[5] Order of November 21, 2001, pp. 6-26, accepting RPC's limitations claims only with regard to Counts I (breach of contract, as to RPC only) and Count V (violations of the New York Franchise Act [alleged against RPC only]) to the extent such claims were based upon the 1992 Franchise Agreement. RPC's limitations claims were rejected with regard to Counts II, III, and IV, and to the extent the plaintiffs' claims under Counts I and V arose out of the 1996 Franchise Agreement.

advanced by RPC in its prior Motion for Summary Judgment.[6]

As established further hereafter, Broadhurst's Motion for Summary Judgment should be denied.

## II. STATEMENT OF THE CASE

Within their Second Amended Complaint the plaintiffs advance claims against Broadhurst individually, *and* in his capacity as a director of RPC. Claims of fraud, intentional misrepresentation, concealment and negligent misrepresentation (Count II, incorporating the allegations of paras. 1-51, and 72-83 of the Second Amended Complaint), violations of the North Carolina Unfair & Deceptive Trade Practices Act (Count III, incorporating the allegations of paras. 1-58 and 65-83 of the Second Amended Complaint), and violations of the New York Consumer Protection from Deceptive Acts and Practices Act (Count IV, incorporating the allegations contained in paras. 1-58 and 65-83 of the Second Amended Complaint) comprise claims advanced against Broadhurst individually, i.e., apart from Broadhurst's alleged acts and omissions in his capacity as a director of RPC.

The plaintiffs also allege claims against Broadhurst as an individual with regard to his actions as a director of RPC during the period March 1992 through October 1994 (Count VI, incorporating the allegations contained in paras. 1-71 of the Second Amended Complaint). The specific allegations against Broadhurst in his capacity as a director of RPC are contained in paras. 73-81 of the Second Amended Complaint, which allegations in summary claim that Broadhurst failed to fulfill his obligations as a director of RPC in accordance with the "ordinary prudent man standard" applicable

---

[6]Order of November 20, 2001, pp. 18-19.

under both New York and North Carolina law.[7]

Within its Order filed November 20, 2001, the Court considered RPC's Motion for Summary Judgment. The Court denied RPC's statute of limitations claims with regard to the plaintiffs' breach of contract and implied covenant claims (Count I), and with regard to RPC's failure to comply with the New York Franchise Act (Count V), except with regard to claims based upon the 1992 Franchise Agreement (as opposed to the 1996 Franchise Agreement).[8] The Court also denied RPC's summary judgment motion regarding Plaintiffs' fraud, intentional misrepresentation, concealment and negligent misrepresentation claims (Count II)[9], as well as RPC's summary judgment claim based upon a purported absence of "justifiable reliance" with regard to the plaintiffs' fraud and misrepresentation claims.[10] RPC did not advance a statute of limitations claims with regard to the plaintiffs' North Carolina UDTPA claim.[11]

The plaintiffs thereafter filed their Second Amended Complaint in compliance with the Court's Order filed November 20, 2001.[12] As discussed further hereafter, the statute of limitations, and

---

[7]The law in this regard is discussed in the plaintiffs' previously submitted: Plaintiffs' Reply in Opposition to Motion to Dismiss by Individual Defendants (November 16, 2000), pp. 20-21; Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Reconsideration (June 1, 2001), p. 19.

[8]Order at pp. 7-11, and 21-22.

[9]Order at pp. 11-19, and plaintiffs' claims under the New York Consumer Protection Act (Count IV). Order at pp. 22-26.

[10]Order at pp. 18-19.

[11]RPC's only claim was that an "in-state injury" had not occurred, which claim was rejected by the Court. Opinion at pp. 19-21.

[12]Order at pp. 27-31.

reliance claims advanced by Broadhurst in his pending Motion for Summary Judgment are identical to those previously advanced by RPC, and rejected by this Court pursuant to its Order of November 20, 2001.

## III. REPLY FACTS

Beginning on July 1990,[13] through at least March 1994, the Defendant **Harold T. Broadhurst** ("Broadhurst") was extensively involved in the development of RPC's marketing "system", and "Full Service Program"/FSA. In that capacity Broadhurst played a significant role in the development of RPC's marketing "system," and materials, including: developing sales training and presentation manuals, which contained a specific script prescribing precisely how the Rich Plan system was to be presented to consumers, including a specific presentation regarding Rich Plan's "Full Service Agreement" ("FSA"); materials regarding RPC's marketing concept generally, including RPC's form FSA for use by franchisees, including plaintiffs; a training video for franchisee sales personnel regarding the FSA; extensive advertising and other materials to assist in the implementation of the marketing of RPC's FSA to consumers in North Carolina. *See* Singletary/Baldwin affidavit of November 16, 2000, paragraph 1, and Exhibit 1 thereto;[14] RPC's "Concept Video;"[15] RPC marketing materials order form (Exhibit 15 of plaintiffs' previously submitted Appendix to the Plaintiffs' Memorandum of Law in Opposition to RPC's Motion for Summary Judgment, July 16,

---

[13]Two years before Broadhurst became an RPC director.

[14]This affidavit (as Exhibit 11), and the exhibits referred to therein, are contained within the plaintiffs' previously submitted Appendix to their Reply in Opposition to Motion to Dismiss by Individual Defendants," filed with the Court on November 16, 2000 (hereafter referred to as "Appendix I).

[15]Setting forth specific descriptions of the FSA, and the manner in which the FSA should be presented by franchisees to consumers.

2001, hereafter referred to as "Appendix II"); RPC's "Super Shopper Coupon Promotional Brochure (Appendix II, Exh. 16); "The Golden Anniversary Freezer" brochure (Appendix II, Exh. 20); RPC's promotional brochure referencing various food products offered (Appendix II, Exh. 21); RPC's "Premium Food - Premium Service" marketing brochure (Appendix II, Exh. 22). All of these documents were an integral part of the RPC marketing "system," including RPC's FSA program, and documentation, that the plaintiffs were required to implement and offer to all prospective customers pursuant to Article 10 of their franchise agreement with RPC dated November 15, 1996[16]. *See also* Appendix I, Exhibit 11, Singletary/Baldwin Affidavit paras. 2-5; Appendix II, Exhibit 5 para. 3. Mr. Broadhurst also represented to the Plaintiffs that he had personally participated in, and supervised, the creation of these marketing programs and materials, including RPC's form FSA,[17] and the RPC "Basic Presentation Sales Manual.[18] Baldwin/Singletary April 29, 2002, Supplemental Affidavit (submitted herewith) paras. 2, 4-7.

Broadhurst was such a central figure in the development and implementation of the RPC "Full Service Program"/FSA, both before and during his time as a director of RPC, that he was compensated as a consultant for his efforts. In April 1991, well before he became a director, the RPC board authorized the payment of $25,000 to Broadhurst "for work that he has performed for the

---

[16]Appendix II, Exh. 2.

[17]Appendix II, Exhibit 10.

[18]Appendix II, Exhibit 19, containing an entire detailed script for presentation of RPC's marketing "system," including the specific manner in which the FSA was to be offered (*see* Exhibit 19, pp. 17-19).

company since July 1990, and continues to perform".[19] Also, at the RPC board meeting of April 12, 1991, Broadhurst was given direct authority over the work schedule, and thus compensation, of Mr. David Lortscher, a franchise consultant who had been hired by RPC to work with Broadhurst on developing, recruiting and implementing RPC's franchising program, and the accompanying "Full Service Program"/FSA documentation. *Id.*

In addition to overseeing the development of the Full Service Program"/FSA, before plaintiffs entered into their initial franchise agreement with RPC in 1992, on August 11-13, 1991, before Mr. Broadhurst became a director of RPC, the plaintiffs met with Broadhurst, at his invitation, at RPC's headquarters in Utica, New York.[20] At that time Mr. Broadhurst presented RPC's marketing concept and "system" to the plaintiffs, and discussed with them the specific concept of the FSA, representing that implementation of the FSA would increase sales and reorders of products. At that time the plaintiffs also attended an RPC training program prepared by Mr. Broadhurst, and presented by his sales director, regarding the way the RPC "system" should be marketed in North Carolina, including the FSA. (Appendix I, Exhibit 11 paras. 2-3, Singletary/Baldwin affidavit). Broadhurst also sent plaintiffs a letter on September 11, 1991,[21] containing a specific and detailed script of how RPC's FSA was to be sold by the plaintiffs. (Appendix I, Exhibit 11 para. 4, and exhibit 2 attached

---

[19]*See* April 12, 1991, Minutes of RPC Board of Directors Meeting regarding an "update" on marketing, and April 22, 1991 memorandum from Broadhurst to the RPC Board of Directors extensively revising and extending the minutes of the April 12, 1991, board meeting. Exhibits 1 and 2 attached hereto.

[20]Before this meeting, in July 1991, Broadhurst corresponded with plaintiffs regarding the schedule and agenda for their initial training visit. It was at this training that plaintiffs were first instructed by Broadhurst (well before he was a director of RPC) regarding the RPC "system, and "Full Service Program"/FSA. Appendix I, Exhibit 11 para. 3.

[21]Seven months before Broadhurst ever became an RPC director.

thereto). Thereafter, on January 29, 1992, Broadhurst came to North Carolina and conducted a three (3) hour training session for plaintiffs' sales personnel regarding how the RPC "system"/FSA should be sold. (Appendix I, Exhibit 11 para. 5, and exhibit 2 thereto [setting forth the agenda for that training meeting]). Despite having prepared or supervised the preparation of all of these RPC marketing materials regarding the FSA "system," and documents, Mr. Broadhurst never informed the plaintiffs that these materials, which Mr. Broadhurst clearly expected and intended Plaintiffs would use to implement the RPC "system" in North Carolina, were not, or might not be, in compliance with North Carolina law, or that the plaintiffs should independently determine whether such "system," and materials, complied with North Carolina law. (Appendix I, Exhibit 11 para. 8; Appendix II, Exhibit 5 paras. 4, 7-10, 13, 16-17). Rather, the plaintiffs relied upon Mr. Broadhurst's knowledge and experience, believing in good faith that the materials, information and training received from Mr. Broadhurst, and RPC, in order to implement RPC's marketing "system" in North Carolina, were legal. (Appendix I, Exhibit 11 para. 8; Appendix II, Exhibit 5 paras. 3, 5, 9, 17).

Then, in October 1993, in addition to his other responsibilities as an RPC director, Broadhurst was assigned to a special committee charged with reviewing, and making uniform, the "Full Service Program"/FSA being sold by RPC franchisees.[22]

Broadhurst therefore played a critical and integral role both before, and during, his tenure as an RPC director, in developing, reviewing and revising the RPC "Full Service Program"/FSA programs, and implementing documentation, that would eventually be used in good faith by the plaintiffs in North Carolina, and become the central focus of the investigation and prosecution by the NCAG that resulted in the virtual destruction of the plaintiffs' business.

---

[22]October 7, 1993, RPC Minutes of Board Meeting, Exhibit 3, item #5, attached hereto.

Then, after he claims to have left the board of RPC (October 1994), in the winter of 1995, after prior attempts on the part of Broadhurst to persuade Plaintiffs to implement RPC's FSA in North Carolina, Plaintiffs met with Broadhurst in Rocky Mount, North Carolina, to further discuss the implementation of RPC's "Full Service Program." At that time Mr. Broadhurst informed Plaintiffs that, if they did not implement RPC's "Full Service Program" and FSA, the plaintiffs would probably go out of business. Shortly thereafter, in reliance upon the representations of Mr. Broadhurst (and Mr. Geist) regarding RPC's "Full Service Program," as well as on the contract representations that RPC had made to the plaintiffs regarding the "unique," "distinctive," and "successful" merchandising program that RPC/Broadhurst had developed, the plaintiffs made the decision to begin to implement the "Full Service Program" with North Carolina consumers. The plaintiffs were then provided with RPC's Full Service Program" and FSA materials, and training materials, all of which had been prepared by Broadhurst, or under his supervision. The materials plaintiffs were provided included RPC's "Basic Presentation Sales Manual" (Exhibit 19, Appendix II) containing the specific consumer sales script prepared by Broadhurst that was to be followed by the plaintiffs in the presentation of the FSA to consumers.[23] (Appendix I, Exhibit 11 paras. 6, 8; Appendix II, Exhibit 5 paras. 2-3).

Despite the fact that he had prepared and/or supervised the preparation of all such marketing materials, the plaintiffs were never told by Broadhurst that the materials or "system" they had been provided by RPC would, or might, be in violation of North Carolina law, or that the plaintiffs should independently determine whether RPC's marketing "system," or the "Full Service Program," or form FSA might, would, or did violate North Carolina law. (Appendix I, Exhibit 11 para. 8; Appendix II,

---

[23] Article X(A)(3)-(5) required that the plaintiffs use these materials, and script.

Exhibit 5 paras. 4, 7-10, 13, 16). Rather, the plaintiffs reasonably believed and expected that the extensive marketing materials and training they had received from Mr. Broadhurst, both before, during and after the time he was a director of RPC, had been properly developed, and could be legally sold to North Carolina consumers. (Appendix II, Exhibit 5 paras. 3-5, 9, 13). Additionally, after the plaintiffs entered into their 1996 franchise agreement, after Broadhurst was no longer an RPC director, Broadhurst expressly recommended selling prices to the plaintiffs for their products, FSAs, and appliances, including his recommendation that the plaintiffs raise the price of their FSA as offered to North Carolina consumers. In making these recommendations Broadhurst informed the plaintiffs that it did not matter what prices they charged so long as the Rich Plan "concept" was stated properly to consumers through the use of the 20% discount concept included in RPC's "Full Service Program" that Broadhurst had designed. Broadhurst at that time also provided advice and direction to the plaintiffs regarding the design of their sales directors' and sales managers' compensation package designed for the purpose of selling more FSAs. (Singletary/Baldwin Supplemental Affidavit of April 29, 2002, para. 3).

Relying in good faith upon the extensive materials, program, and training developed by RPC and Broadhurst, through approximately April 3, 1998, the plaintiffs sold approximately 2,000 FSAs to North Carolina consumers. If Broadhurst individually, or during the time he was a director of RPC, had informed the plaintiffs of the actual, or possible, illegality of RPC's "Full Service Program", or that the plaintiffs should check the legality of this proprietary program before offering it to North Carolina consumers, there were numerous alternatives that would have been available to the plaintiffs in order to avoid the catastrophic destruction of their business that occurred thereafter as a direct result of the North Carolina Attorney General's ("NCAG") attack on RPC's marketing

"system," and "Full Service Program"/FSA. (Appendix II, Exhibit 5 paras. 6-18).

In response to this undisputed evidence of Broadhurst's personal and individual development of the marketing "system," and "Full Service Program," that is the subject of this litigation, Broadhurst's continual recommendations that the plaintiffs implement these programs, and the extensive training provided by Broadhurst when he was not a director of RPC in 1991-92, and 1995-1996, all of which resulted in the destruction of the plaintiffs' business, Broadhurst seeks to avoid liability for his acts and omissions by claiming that he was a director of RPC only during the period March 1992 to October 1994, that he had no knowledge of the potential illegality of the "Full Service Program" in North Carolina. (Broadhurst Memorandum of Law at p. 2), and that the plaintiffs did not justifiably rely on the "system," documents, training and advice Broadhurst provided. (Broadhurst Memorandum of Law at pp. 5-6). However, in concessions that fully support the plaintiffs' allegations, and which one consistent with the record evidence, Broadhurst admits that his "expertise was sales," and that the "plaintiffs sought his advice regarding sales methods and techniques...," with regard to RPC's "system," and "Full Service Agreement." (Broadhurst Memorandum of Law at p. 2).

## IV. ARGUMENT

### A. Broadhurst is liable for both his individual acts and omissions, and for his acts and omissions as a director or employee of RPC.

Broadhurst's motion is based almost entirely on his argument that he was only a director from March 1992 to October 1994, that the wrongful acts and omissions attributable to him are only in his capacity as a director of RPC and, as a result, any claims based upon those acts or omissions are barred by applicable statutes of limitation. As established hereafter, this argument is incorrect for two

reasons: First, claims are alleged by the plaintiffs against Broadhurst as an individual, *and* in his capacity as a director of RPC; second, statutes of limitation applicable to the plaintiffs' claims under both New York and North Carolina law imposing individual liability upon officers and directors do not bar the plaintiffs' claims, since Broadhurst's wrongful actions as an RPC director during 1992-1994 were not discovered until significantly later, and "cognizable injury" was not suffered from such wrongful acts occurring in 1992-1994 until significantly later.

1. **Broadhurst is liable for his individual wrongful acts and omissions apart from liability arising out of his wrongful acts as a director during the period 1992-1994.**

As early as July 1990 (and likely even before that), before ever becoming an RPC director, Broadhurst was a "marketing expert" and consultant to RPC, primarily responsible for developing the RPC "Full Service Program"/FSA, and franchise network through which that "system" would be sold. (Exhibit 1 hereto, RPC board meeting of April 12, 1991; Exhibit 2, April 22, 1991 memo of Broadhurst).[24] Broadhurst also met with the plaintiffs on August 11-13, 1991, at Broadhurst's invitation, at which time Broadhurst presented RPC's marketing concept and "system" to the plaintiffs, and discussed with them the specific concept of the FSA, representing that the implementation of the FSA would increase sales and reorders of products. At that time the plaintiffs also attended an RPC training program prepared by Broadhurst, and presented by his sales director, regarding the way the RPC "system" should be marketed in North Carolina, including the FSA. (Appendix I, Exhibit 11, paras. 3-4).

Additionally, <u>after</u> Broadhurst had resigned as a director (October 1994), the record

---

[24]As such, Broadhurst received compensation as a consultant to RPC. *See* Exhibit 1 hereto, acknowledging the payment of $25,000 from RPC to Broadhurst for his marketing and franchise work from July 1990, which "he continues to perform".

establishes that he engaged in significant additional activities promoting the "Full Service Program"/FSA to the plaintiffs, in fact pressuring them to implement that program using the materials designed by Broadhurst himself. In the winter of 1995 Broadhurst met with the plaintiffs in Rocky Mount, North Carolina, to further discuss their implementation of RPC's "Full Service Program." Broadhurst then informed the plaintiffs that, if they did not implement RPC's "Full Service Program" they would probably go out of business. In reliance upon the representations of Mr. Broadhurst (and Mr. Geist), the plaintiffs made the decision to begin to implement the "Full Service Program" in North Carolina. They were then provided with the "Full Service Program"/FSA materials that had been prepared by Broadhurst, which materials Broadhurst obviously intended, and expected, the plaintiffs would use to implement the marketing program he had convinced the plaintiffs to adopt, and which the 1996 Franchise Agreement contractually obligated them to implement in North Carolina. (Appendix II, Exhibit 5, paras. 2-3). Thereafter, Broadhurst recommended selling prices for the plaintiffs' products, FSAs, and appliances, including his recommendation that the plaintiffs raise the price of their FSA as offered to consumers, stating that it did not matter what prices they charged so long as the Rich Plan concept, and 20% discount, was stated properly to consumers. Broadhurst also provided advice and direction to the plaintiffs regarding the design of compensation packages for their employees for the purpose of selling more FSAs. (Singletary/Baldwin Supp. Aff. of April 26, 2002, paras. 3-4).

In addition to those claims advanced by the plaintiffs against Broadhurst in his capacity as a director of RPC during the period 1992 - 1994, the plaintiffs have therefore also advanced claims

against Broadhurst individually for his wrongful actions outside of the time when he was a director,[25] which allegations, as established earlier, are fully supported by the record. In fact, in his memorandum of law Broadhurst admits that his "field of expertise was sales," that the "plaintiffs sought his advice regarding sales methods and techniques," and further concedes that "the majority of Mr. Broadhurst's dealings with plaintiffs were in his capacity as vice-president of sales and marketing at Rich Plan of Utica, Inc.," i.e., *other than* in his capacity as a director of RPC.[26] Broadhurst's own admissions therefore compel a denial of this motion for summary judgment with regard to the plaintiffs' individual claims against him.

## 2. Broadhurst is also liable to the plaintiffs for his acts and omissions while a director of RPC.

As established by the plaintiffs' affidavits, it was Broadhurst who was primarily responsible for designing RPC's "Full Service Program"/FSA that was attacked by the NCAG, and which resulted in the destruction of the plaintiffs' business. That is the same program that was in existence, and recommended to the plaintiffs, during the period 1992-1994, when Broadhurst was a director of RPC.

---

[25]. The plaintiffs' claims of fraud and misrepresentation (Count II), violations of the North Carolina UDTPA (Count III), and violations of the New York Consumer Protection Act (Count IV) each contain allegations relating to these claims against Broadhurst individually. *See*, e.g., Second Amended Complaint, paras. 32, 34, 52-64, 82 ("The actions and failures of the individual defendants Geist, Wilson, and Broadhurst individually, and as officers and/or directors of RPC, resulted in the commission of statutory violations by such persons for which they are jointly and severally reliable pursuant to applicable New York law") and 83 ("As a result of the conduct and activities of the defendants Geist, Wilson and Broadhurst, individually, and as officers and/or directors of RPC, the plaintiffs have suffered significant damages in an amount as yet fully undetermined, but in excess of $75,000")

[26]Broadhurst Memorandum of Law at p. 2, with citations to his Second Supp. Aff., para. 3.

Broadhurst's wrongful acts and omissions while a director of RPC were therefore not limited to RPC's failure during the period 1992-1994 to comply with both federal and New York law with regard to the offering of franchises, including RPC's failure to make the factual disclosures to the plaintiffs pursuant to the required Uniform Franchise Offering Circular ("UFOC"), which would have necessarily informed the plaintiffs of the illegality, or potential illegality, of the "Full Service Program"/FSA, and/or of the obligation of the plaintiffs to independently ascertain whether the "Full Service Program"/FSA could be legally implemented in North Carolina. RPC's internal memoranda of October 15, 1997 (Appendix II, Exh.3) concedes that "[T]he issue of memberships being interpreted as insurance *has happened in the past*, and may become a regulatory issue *again,* on a state-to-state basis." RPC's own internal memorandum therefore concedes that the insurance problems related to the FSA had occurred "in the past," thereby raising a reasonable inference from which the trier of fact could determine that RPC, inclusive of its board of directors, and Broadhurst, had direct knowledge of the actual, or potential, illegality of the "Full Service Program"/FSA well before1997, which would, of course, include the period 1992-1994. Broadhurst's attempt to cavalierly dismiss this express memorandum is unsupportable, and Broadhurst fails to provide any legal citation with regard to this argument. The factual determination of Broadhurst's knowledge is ultimately up to the trier of fact.

Additionally, Broadhurst's argument seeking to avoid his liability as a director ignores his obligation to exercise ordinary diligence and skill in *ascertaining* the condition of corporate business, and being accountable for that which he *reasonably should have known or discovered in the discharge of his duties*. Manheim Dairy Co. v. Little Falls Nat'l Bank, 54 NYS.2d 345, 365 (1945). The determination of the facts concerning an officer/director's knowledge and conduct, and the

circumstances in which they existed, as well as any determinations of how they relate to the applicable legal standard, are best left for resolution by the trier of fact at trial, and are not normally susceptible of summary disposition. Bernstein v. Mediobanca di Credito Finanziario Societa Per Azioni, 69 Frd 592, 598 (S.D.N.Y. 1974), cited within Clark, et al. v. B.H. Holland Co., Inc., et al., 852 F.Supp 1268, 1276 (E.D.N.C. [Raleigh Division] 1994).

The record evidence therefore establishes that Broadhurst is liable for his wrongful acts and omissions during the period of 1992-1994 when he was a director of RPC, as well as for his individual acts and omissions that occurred outside of that time period. Broadhurst's statute of limitations claim regarding his liability as a director under both New York and North Carolina law are discussed hereafter.

**B.** **Broadhurst's claim regarding the lack of the plaintiffs' "justifiable reliance" upon his misrepresentations and concealments has been previously rejected by the Court.**

Broadhurst claims (memo at 5-6) that the plaintiffs' claim of fraud, misrepresentation, negligent misrepresentation and concealment must be rejected because there is no evidence that they "justifiably relied" on any acts, or omissions by Broadhurst. This identical claim was made by RPC in its prior motion for summary judgment, and rejected by the Court within its Order of November 20, 2001, at pp. 18-19.

Clearly, Broadhurst intended, and in fact cajoled, the plaintiffs to implement the "Full Service Program"/FSA in North Carolina. He knew that the only way in which this could be done was for the plaintiffs to implement the program using the materials that he had created for that specific purpose. These included not only the FSA form, but presentation manuals, specific scripts regarding consumer presentations of the FSA, training videos, advertising and marketing materials, and

providing training specific to the "Full Service Program"/FSA. (Appendix I, Exhibit 11, para. 1; Appendix II, Exhs. 10, 15, 16, 20, 21, 22).

The record establishes that the plaintiffs relied completely upon the representations of Broadhurst, implied and otherwise, that the program he had designed, cajoled and was assisting the plaintiffs to implement, was in fact legal or, alternatively, if Broadhurst did not know it was legal, was unsure, or believed that the plaintiffs were independently responsible for determining the illegality of the program, that such a representation/disclosure would be made to them. Appendix I, Exh. 11, para. 8; Appendix II, Exh. 5, paras. 3-5, 7-10, 13.

Finally, as previously held by the Court in rejecting RPC's identical "reliance" argument, justifiable reliance is a fact-intensive inquiry, and "[T]he factual issues in dispute in this case preclude an award of summary judgment with respect to plaintiffs' fraud and misrepresentation claims. (Citation omitted) As the Court has held previously, the determination of whether reliance was justifiable is a question of fact to be determined by the trier at trial." Order of November 20, 2001, pp. 18-19.[27]

> **C.** **Neither the claims against Broadhurst individually, or relating to his status as a director of RPC, are barred by any applicable statute of limitations.**
>
> > **1.** **Statute of limitations claims with regard to the plaintiffs' fraud and misrepresentation claims (Count II), and New York Consumer Protection Act violation (Count IV) were previously advanced by RPC, and rejected by the Court.**

---

[27] In his memorandum Broadhurst makes no reference to this prior dispositive ruling by the Court. Rather, he cites only to North Carolina cases which, are, of course, inapplicable since, as the Court has previously ruled, New York law is controlling regarding all non-procedural (i.e., substantive) law issues in this claim pursuant to the Franchise Agreement. Order of November 20, 2001, at pp. 7-8.

The very same statute of limitations claims now advanced by Broadhurst with regard to the plaintiffs' fraud and misrepresentations claims, and alleged violations of the New York Consumer Protection Act (Count IV),were rejected by the Court within its prior Order of November 20, 2001, at pp. 11-18, and 22-26 respectively. The claims of Broadhurst are indistinguishable, deserve no further consideration than that previously accorded to the same claims advanced by RPC, and should be similarly rejected.

### 2. Broadhurst's limitation claim regarding the North Carolina UDTPA should be rejected.

Contrary to Broadhurst's argument, his wrongful acts and omissions are not limited to the time when he was acting as a director. Rather, his wrongs continued well after that time, and included the plaintiffs' good faith implementation of the "Full Service Program" created by him, along with all of the FSA materials he had created both before, after, and during the time he was a director of RPC. Broadhurst in his argument (Memo at p. 8) concedes that the North Carolina UDTPA statute of limitations is based upon the *discovery* of the wrong in question.[28] The facts, and applicable law, with regard to this case relative to the issue of "discovery" of the wrongs in question have been fully reviewed by the Court in its prior Order of November 20, 2001, at pp. 12-18 in the context of the plaintiffs' fraud and misrepresentation claims. The same rationale with regard to "discovery" is applicable to Broadhurst's limitations arguments regarding the North Carolina UDTPA. Consistent with the Court's prior review of this same issue, Broadhurst's limitations claims regarding the North Carolina UDTPA should therefore be rejected.

---

[28]*See*, confirming this concession, Hand v. Ace Hardware Corp., No. 4:92 CV00454 (M.D.N.C. July 7, 1995): If an action for unfair and fraudulent trade practices is based on fraud, the action doe not accrue until discovery of the fraud, citing Nash v. Motorola Communications & Electric, Inc., 96 N.C. App. 329, 313 (1989), aff'd, 328 N.C. 267, 400 S.E.2d 36 (1991).

**3.** **Broadhurst's limitations claim regarding his liability as a director should be rejected.**

As is the case with regard to the applicable statute of limitation under the North Carolina UDTPA, discussed immediately above, the applicable limitations pursuant to New York,[29] and North Carolina law[30] provide that the applicable statute of limitations relating to the individual liability of officers/directors of corporations arises from the nature of the underlying wrong or tort alleged.[31] Therefore, the applicable statute of limitations under both New York and North Carolina law relating to the plaintiffs' claims of fraud, misrepresentation, concealment and negligent misrepresentation engaged in by Broadhurst as a director of RPC during the period 1992-1994, have a three-year statute of limitations from the date of _discovery_. _See_, N.C.G.S. § 1-52(9), and the Court's prior discussion of this issue in its order of November 20, 2001, p. 11, fn. 4.[32]

As the Court has previously held, the plaintiffs' fraud claims are not barred by the applicable statute of limitations. _See_, Order of November 20, 2001, at pp. 11-18. Such claims are therefore cognizable pursuant to the plaintiffs' allegations with regard to Broadhurst's failure to comply with the "ordinary prudent man" standards established under both New York and North Carolina law with

---

[29]New York Business Corporation Law §§ 715 and 717.

[30]NCGS § 55-8-30 (directors).

[31]There appears to be a paucity of law on this matter. However, this principle have been applied in the following cases: _State ex. rel. Howes v. W.R. Peele, Sr., Trust_, 876 F.Supp 733, 739 (E.D.N.C. 1995); _Isanaka v. Spectrum Technologies USA, Inc._, 131 F.Supp 2d 353, 2001 WL 197911 (N.D.N.Y., Feb. 18, 2001). _See also_, the Court's prior discussion of the application of statutes of limitation arising out of underlying allegations of wrongful conduct at the Court's Order of November 20, 2001, p. 11, fn. 4.

[32]As previously discussed, the Court has held that procedural statute of limitations determinations are to be governed by North Carolina law.

regard to the acts and omissions of corporate directors.

Additionally, the effect of Broadhurst's failure to act as an "ordinary prudent man" in fulfilling his obligations as a director of RPC during the period of 1992-1994 was to not only deprive the plaintiffs of the information that RPC's marketing programs were, or might be, illegal in North Carolina, or that the plaintiffs were independently obligated to make that determination, but also resulted in RPC failing to rectify its then continuing complete disregard of the franchise registration and disclosure laws of both New York and the United States. Clearly, if in 1992-1994 RPC had addressed, and resolved, its complete failure to provide the statutorily required disclosures regarding its franchise and marketing "system," the plaintiffs would have, of necessity, been provided with the information that would have allowed them the opportunity to avoid the violations of North Carolina law that arose as a result of their good faith implementation of the "Full Service Program"/FSA in North Carolina in late 1995, and thereafter.

Since, as previously established, Broadhurst was intimately involved in not only RPC's marketing activities, but its franchising activities as well, and was at least in substantial part responsible for the ongoing activities of Mr. Lortscher (RPC's franchise consultant), reasonable efforts at legal compliance with applicable franchise laws undertaken by the RPC board, including Broadhurst, during the period 1992-1994, would have resulted in the plaintiffs being provided with the information they had been denied regarding the illegality of the "Full Service Program"/FSA and, thereby, provided the plaintiffs an opportunity to preserve their business, which they were denied as a result of Broadhurst's failure to comply with his "ordinary prudent man" obligations.[33]

---

[33]As stated previously, it was Broadhurst's obligation, as a director, to ascertain whether RPC was in compliance with applicable franchising laws, and he was accountable for that which he reasonably should have known, or discovered, in the discharge of his duties.

**D.** **Broadhurst's claimed "lack of knowledge" of the illegality of the "Full Service Program"/FSA is a question of fact, and otherwise irrelevant.**[34]

    1.    **Broadhurst's knowledge of the illegality of the "Full Service Program"/FSA is a question of fact.**

As discussed previously, the existence of the October 15, 1997, memo,[35] in and of itself, creates a question of fact with regard to the knowledge of Broadhurst regarding the illegality of the RPC programs he had designed, and implemented with the plaintiffs. Additionally, Broadhurst concedes that he was a "marketing expert," and that it was to him, based on this expertise, that the plaintiffs were specifically looking for assistance with regard to the "Full Service Program"/FSA, and its implementation in North Carolina.

Ultimately, as established earlier, it is a question of fact for the trier to determine, at trial, both the extent of Broadhurst's actual knowledge of illegality, Broadhurst's obligation to determine the actual, or potential illegality of RPC's programs developed by him, and to determine the nature, and extent, of the plaintiffs' reliance.

    2.    **As a director of RPC Broadhurst was legally obligated to determine the illegality, or possible illegality of RPC's programs.**

As previously discussed, while a director of RPC Broadhurst could not simply sit back and allow the plaintiffs to suffer from the wrongs and inattentions of RPC with regard to its marketing programs, nor with regard to its complete disregard of franchise laws. Broadhurst had an affirmative

---

[34]Broadhurst provides no legal citation whatsoever in support of his argument regarding his claimed "lack of knowledge."

[35]Appendix II, Exh. 3.

obligation, in the fulfillment of his "ordinary prudent man" responsibilities, to investigate, and to insure that the activities of RPC were in compliance with the law. Neither he, nor the other individual defendants, did anything in this regard.[36]

Whether Broadhurst knew of the illegality, or potential illegality, of RPC's programs, is therefore irrelevant to his liability arising out of his being a director during the period 1992-1994. He was obligated to investigate and find out.

> **3.  Broadhurst had a duty individually, as a self-declared expert from whom the plaintiffs sought advice, at his invitation, to determine the legality of the RPC programs he had designed.**

By Broadhurst's own admission, he was a marketing expert who *knew that the plaintiffs were looking to him for that expertise as the designer of the very program that resulted in the ultimate destruction of their business.* As an admitted expert in the field, with a full understanding of the role he was playing in the expectation of the plaintiffs, Broadhurst had a duty to ascertain the actual or potential illegality of the "Full Service Program"/FSA as he knew, and recommended, it be implemented in North Carolina. At the very least, Broadhurst had an obligation to inform the plaintiffs that it was their independent obligation to determine such potential illegality. He did none of these things, any one of which would have resulted in the plaintiffs avoiding the destruction of their business.

Broadhurst's arguments regarding his purported "lack of knowledge" are therefore unsupportable, irrelevant, and should be rejected.

---

[36]The record establishes that neither Geist, Wilson nor Broadhurst did anything whatsoever with regard to RPC's non-compliance with franchise laws, nor with regard to taking any steps whatsoever to determine the legality, or illegality, of RPC's marketing programs.

## V. CONCLUSION

For the reasons set forth herein, Broadhurst's Motion for Summary Judgment should be denied.

Date: April 29, 2002.

FARRELL & LA MANTIA

Richard W. Farrell
4900 Falls of Neuse Road, Suite 212
Raleigh, North Carolina 27609
Phone: (919) 872-0300
Fax: (919) 872-0303

The next item was to discuss what compensation the company should pay Harold Broadhurst for the work that he has performed for the company since July 1990 and continues to perform. Evans felt that the work that Harold had done in 1990 was worth about $15,000 to $20,000 and the work in 1991 was worth about $10,000 the payment would not be out of the marketing budget. Evans would discuss with Harold a method of payment and the amount whether it be $25,000 or $30,000 for 1990 and 1991 not separating payment amount for one year or the other.

The meeting was adjourned at 4:15 PM.

Respectfully submitted,


R. Bruce Evans
Secretary

RBE/dy

EXHIBIT 1

# RICHPLAN

April 22, 1991

TO:       Board of Directors
          Marketing Committee
          Herman Geist

FROM:     Harold T. Broadhurst, Rich Plan Corporation

RE:       Minutes of the Meeting at Marriott Courtyard, 4/12/91


The main thrust of the meeting was to set the direction and the goals of the Corporation, keeping in mind the need of the dealers and the need for corporate growth and the need for a responsible budget.

Mr. Broadhurst and Mr. Lortscher outlined 6 marketing projects with estimated budgets for each (copies enclosed). After discussion of each project, the following actions were to be taken:

1.    The Stuffer/Hangers: A copy to be mailed to each Dealer for their input, as well as, their order. Based on 400,000 and a cost of $.03 each with a dealer imprint cost of $150 for the return card. Because these will be used in large quantities as newspaper stuffers, it is hoped that we can print a million or more, the more we print the cheaper it will be. We do hope to use the 8½ x 14" size.

2.    Food Brochure: This project is already moving forward. Warren Copeland is contacting our suppliers regarding color transparencies, as will as, cash donations to keep within the budget. We have 164 items under Rich Plan label, but we will consider putting other products in our food catalog as long as they have been a good product name and are willing to put up some cash. (No cash, no products in book)

3.    Quarterly Mailer: Because of seasons, different month, months of mailings, and questions as to what quantities would be used, it was decided to put this project on the back shelf.

4.    Sales Award Brochure: We will go to four pages and order a 3 year supply of 7,000, so that we can reduce our cost on this expensive item.

Rich Plan Corporation
P.O. Box 224, Utica, N.Y. 13503
1-800-243-1358 • (315) 736-0851
Fax (315) 736-7597

EXHIBIT 2

RPC 1368

5.   Sales Awards/Travel Club:   This is our biggest expense with most of it expected to be spent on the new Travel Club awards.

6.   Dealer Recruitment Activity:   We will probably not have a booth at any show this year, but we do intend to pursue a hospitality suite at the NAMP Convention in Phoenix, Arizona this September.   We will advertise in trade magazines prior to that. Mr. Lortscher and myself, will attend to visit with prospective dealers.

7.   Marketing Committee Meetings: It is anticipated that we will have a need for quarterly meetings.   With fall and winter dealer meetings on our schedule already, two additional meetings should get the job done.

8.   Consultants Fee:   Dave Lortscher's compensation and use was discussed at length.   He has been working for the Corporation on the basis of 2 days per week at $350 a day.   Extra days needed per week at 1st day $200, all others $300.   Problem, extras days billed without prior approval (5 in February, 9 in March) which became very expensive to the Corporation.   Much of his time was spent on travel to and from our Phoenix Dealer Meeting, trips to Utica, New York.   We are still waiting for complete accounting of time.

Effective immediately Mr. Lortscher will not work any additional days without prior approval from Marketing Committee chairman Harold Broadhurst.   Effective May 1, 1991 Mr. Lortscher will be on a retainer of $1,000 per month (in exchange for 3 days per month) extra days as needed at $333 per day, in addition to this he will be paid $1,000 for each new prospective dealer that he visits with our approval, plus his expenses.   If a prospective dealer is franchised, Mr. Lortscher will receive a $1,000 bonus.   This new consultant compensation program has been based on the fact that 80% of his time from this point on will be directed to franchising while only 20% would actually be needed for consulting and marketing programs, dealer meetings, etc.   When you have a chance to review my notes please give me a call to cover any questions that come to mind.

HTB/dy

4.    Monthly Royalty Fee change effective with July 347 Reports. The Board reviewed the comparison of royalty amounts paid by each dealer under the new method, versus the prior method. Although the total royalty paid for July sales and August sales was slightly less under the new method, the Board noted that there was a more equitable spread of contribution among all dealers.

5.    Service Agreement Comparisons. Discussion held about the similar benefits and difference benefits found in samples of different service agreements used by different dealerships. The Board directed Randy Wilson to work with a committee comprised of Duke Adamson, Harold Broadhurst, Douglas Davis, and Roger Lord. A mock-up of a national service agreement draft, similar in design and style to the current Michigan agreement, is to be sent to the committee members by the first week of November. The committee members will note comments and mark-up, and return to Wilson for revisions and second draft. The committee's goal will be to have a final review draft available for mailing to all dealers, in advance of the March 1994 annual meeting.

IV. New Business:

1.    Appointment of Nominating Committee.  Directors Duke Adamson, Herman Geist and Roger Lord were appointed to serve as the Nominating Committee.  Herman Geist agreed to be Chairman of the Committee.  A brief discussion was held about the Committee considering one or two younger dealers as nominees.

2.    Projected Agenda for 1994 Annual Meeting.  A tentative agenda calling for meeting times each morning (Thurs., 3/3/94 through Sat., 3/5/94, Directors Meeting Sunday) was approved by the Board.  No outside program speakers will be sought; vendors may be considered for brief presentations. Roundtable and dealer led discussions will be the format of dealer meeting sessions.

3.    Open Discussion: "Where is Rich Plan Corp. going?" Roger Lord reported that he spoke with one dealer who feels that Corp. should be more involved in helping the dealers generate leads.  Herman Geist suggested that consideration be given to developing meal packages for a target market of working couples and apartment dwellers.  Duke Adamson suggested that attention be given to how Rich Plan frozen foods can satisfy the "wholesome & nutritious food" focus which many consumers have adopted.  Dick Darling noted that without a written plan, it is impossible to measure whether Corp is moving in a desired direction.    T h e discussion was tabled, to move on to the remaining agenda items.



EXHIBIT 3

## CERTIFICATE OF SERVICE

I hereby certify that on this then 29th day of April, 2002, a copy of the foregoing *Plaintiffs' Memorandum of Law in Opposition to Defendant Harold T. Broadhurst's Motion for Summary Judgment* has been served upon the counsel for Rich Plan Corporation and the individual Defendants via regular U.S. mail to:

F. Hill Allen, Esq.
Randall Roden, Esq.
Tharrington Smith, L.L.P.
209 Fayetteville Street Mall
P.O. Box 1151
Raleigh, NC  27602-1151
Facsimile:  829-1583

Charles T. Francis, Esq.
John Austin, Esq.
FRANCIS & AUSTIN, PLLC
P.O. Box 164
Raleigh, NC  27602
Facsimile:  828-0804

Gerald K. Geist, Esq.
Schuman & Sall
One N. Lexington Ave.
White Plains, NY 10601
Facsimile: 914/644-8393

COPY

Dated: this the 29th of April, 2002.

FARRELL & LA MANTIA

Richard W. Farrell
N.C. State Bar No. 16518
4900 Falls of Neuse Road, Suite 212
Raleigh, North Carolina 27609
Telephone:    (919) 872-0300
Facsimile:     (919) 872-0303
Attorneys for Plaintiffs